UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIANCA LANDRY,

                    *Plaintiff*,

          -v.-

BERLIN ROSEN, LLC (DBA Orchestra)
(Including all DBAs and Affiliates)

                    *Defendants*.

**COMPLAINT**

Case No. 24-cv-09375

Jury Trial Demanded

Plaintiff Bianca Landry, by and through counsel, as and for her Complaint against Defendants Berlin Rosen, LLC alleges as follows, on personal knowledge as to her own acts and observations and on information and belief as to all other matters.

## <u>INTRODUCTION</u>

1. This case is brought to remedy violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), The New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL).

## <u>PARTIES</u>

2. Ms. Landry is a resident of Washington D.C. and currently resides in Washington D. C.

3. BerlinRosen, LLC (DBA Orchestra) (hereinafter, "BerlinRosen") is a leading national public relations and strategic communications firm with its principal place of business located in New York City. It is incorporated under the laws of New York, and it is a citizen of New York.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1343. There is complete diversity of citizenship between the Plaintiff (who is a Massachusetts citizen) and Defendants (who are New York citizens), and the amount in controversy, excluding interests in costs, exceeds $75,000. In addition, this action raises claims under a federal civil rights statutes, and the city and state law claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. See 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over the Defendants as the acts and events giving rise to this case occurred in New York, New York.

6.      Venue is proper in the Southern District of New York as the acts and events giving rise to this case occurred in the Southern District of New York.

## STATEMENT OF FACTS

**I.      Background**

7.      Ms. Landry graduated from Texas State University with a Bachelor's degree in Political Science in 2021. While at Texas State University, she was the Director of Public & Internal Relations at the University Star, TSU's award-winning, student-run news organization and one of the oldest publications in Texas.

8.      Ms. Landry first started working at BerlinRosen as a Public Relations Intern in Spring 2022. As an intern, she excelled and proved that her work ethic and initiative would be an asset to BerlinRosen. Out of the six PR Interns in her cohort, BerlinRosen offered Ms. Landry and just one other intern a full-time position.

9.      On September 6, 2022, Ms. Landry started full-time at BerlinRosen as an Account Coordinator on the Cities practice group, reporting to Account Director Margaret "Meg" Fitzgerald.

10.     In this role, Ms. Landry successfully managed the internship program and improved its training materials. She took the lead in her smaller accounts and eagerly assumed client interaction.

11.     BerlinRosen consistently gave her positive feedback, and she was praised by both her teammates and her clients.

12.     Public relations is Ms. Landry's passion; she loves connecting with clients and telling people's stories. Fueled by this passion, she managed as many as 10 accounts simultaneously at BerlinRosen, where the average is five or six.

## II.    Disparate Treatment by Ms. Alli

13.     At the start of her full time employment, Ms. Landry was one of only four Black junior-level employees out of 20+ on the Cities team; the vast majority of managers were White.

14.     Despite her hard work and dedication, BerlinRosen's predominantly White office culture deprived her of opportunities and hindered her career development, as it did her Black peers.

15.     For example, Senior Vice President Emily Alli, the second level supervisor on the Lincoln Center account, refused to communicate with Ms. Landry directly. Instead, Ms. Alli communicated with Ms. Landry through a non-Black employee, Isabeau Touchard. By refusing direct communication with Ms. Landry, Ms. Alli marginalized her and deprived her of quality feedback and professional development opportunities.

### III.    **First Round of Protected Activity; Retaliation**

16.    At the beginning of July 2023, Ms. Landry met with Ms. Fitzgerald and reported Ms. Alli's refusal to communicate with her directly. She also raised concerns about BerlinRosen's lack of diversity.

17.    Further, she reported the stark favoritism in the workplace, which strongly appeared to be race-based in that BerlinRosen's managers, most of whom were White, gave more opportunities to their favorite junior employees, most of whom were White or non-Black.

18.    Ms. Fitzgerald scheduled a follow-up meeting between Ms. Landry, Executive Vice President Matt Tepper and Vice President Helen Cowdrey later that month. Nobody from HR was present, and upon information and belief, Ms. Fitzgerald did not escalate Ms. Landry's discrimination complaint to HR.

19.    During this meeting, Ms. Cowdrey acknowledged that BerlinRosen had "cultural issues" that would "take time" to fix. Mr. Tepper promised Ms. Landry that he would personally help her to achieve her goals on the Lincoln Center account. Ms. Fitzgerald, Mr. Tepper and Ms. Cowdrey all said that they would address the issues directly with Ms. Alli, but nobody ever followed up on this with Ms. Landry. Nor did Mr. Tepper follow up on his promise to help her.

20.    While Ms. Alli did begin to communicate directly with Ms. Landry following this meeting, her communications were hostile and derisive – unlike her communications with other employees on the Lincoln Center account.

21.    On one particular occasion, Ms. Alli berated Ms. Landry on a Google document that was shared with the entire account. Ms. Landry had drafted the document, and Ms. Alli blasted her in the comments, calling the document "useless" to the client, among other vague-yet-scathing critiques.

22.     Following this public display, Ms. Landry sought specific feedback from Ms. Alli on how her document could be improved. Ms. Alli suggested minor formatting changes and said it was fine to send to the client.

### IV.    Racial Tokenism & Stereotyping; More Disparate Treatment by Ms. Alli

23.     In early August, Ryan Jackson, another Black junior employee, left BerlinRosen.

24.     Mr. Jackson told Ms. Landry that he had decided to leave because BerlinRosen's racist culture had stifled his professional development. Mr. Jackson cited issues with some of his account supervisors and managers, such as Senior Vice President Chester Jesus Soria, whom he said had tokenized his Blackness by having him appear at meetings with Black clients, but never inviting him to contribute and ignoring his suggestions at those meetings.

25.     After Mr. Jackson left, Ms. Landry complained to Ms. Fitzgerald via Google Meets about BerlinRosen's racially homogenous culture and its chronic failure to retain Black employees. Ms. Landry also relayed Mr. Jackson's comments about the reasons for his departure.

26.     She confided in Ms. Fitzgerald that she feared BerlinRosen would perceive her as an "angry Black woman" for raising these issues.[1] Ms. Fitzgerald assured Ms. Landry that nobody would think that of her, expressed sympathy and said Mr. Jackson's departure was a "cautionary tale" for other Black staff if BerlinRosen didn't fix its cultural issues.

---

[1] *See, Trina Jones & Kimberly Jade Norwood, Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2044, 2057 (2017) ("...these encounters all carry the risk that if a Black woman were to challenge embedded assumptions, the focus would shift from the aggressor's act to the appropriateness of the Black woman's response [and also] risks the all too familiar conclusion: there she goes--that Angry Black Woman! Why is she so angry? So bent out of shape? So sen-si-tive? In an instant, a Black woman who pushes back against her marginalization gets transformed by society into the 'Angry Black Woman.' Loud. Erratic. Uncontrollable. Full of attitude. The problem becomes the Black woman as opposed to the conditions to which she is responding. In short, the exercise of voice leads to further stereotyping, backlash, and death by a thousand cuts.... Consider the constant stress that countless other Black women face knowing that they risk being labeled an 'Angry Black Woman' and blamed if they speak forcefully or strongly--or if they speak at all.)"

27.     Ms. Fitzgerald then scheduled a follow-up meeting with Ms. Cowdrey and Senior Vice President Jen Shykula for later that month, but Ms. Cowdrey and Ms. Shykula postponed this meeting until November, without explanation.

28.     In October, Ms. Landry's mentor, Account Director Heather Scott, a Black woman, stopped working on the Lincoln Center account. Another Black employee, Account Supervisor Henry Robins, had also stopped working on the Lincoln Center account earlier that year, leaving Ms. Landry as the only Black employee on the account.

29.     Ms. Alli then began to escalate her discriminatory and retaliatory treatment of Ms. Landry.

30.     For instance, when Account Director Pac Pobric, a White man, missed the deadline to send an email which Ms. Landry had timely drafted for him, Ms. Alli sent an email to the entire Lincoln Center account team, blaming, berating and humiliating Ms. Landry for Mr. Pobric's error.

31.     Ms. Landry provided proof that she had sent the email for Mr. Pobric prior to the deadline. Mr. Pobric himself even admitted that he was responsible for the missed deadline, but Ms. Alli continued to blame and berate Ms. Landry for her White colleague's error.

32.     At the beginning of 2023, while looking for a news outlet to cover Lincoln Center's hiring of a new Chief Education Officer – who happened to be Black – Ms. Alli repeatedly singled Ms. Landry out from her non-Black colleagues and interrogated her about "Black media outlets," demanding to know which ones would cover the story.

33.     She also asked: "What Black media outlets do *you* use?" and "Aren't you friends with any Black reporters?" These race-based questions put Ms. Landry on the spot in front of her colleagues and made it clear that Ms. Alli did not think of her as an account coordinator, but as a Black account coordinator – a racial token who was there to provide insight about "Black media."

## V.    Second Round of Protected Activity; Retaliation

34.    In November, Ms. Landry finally met with Ms. Cowdrey, Ms. Shykula and Ms. Fitzgerald to discuss BerlinRosen's discrimination against Black staff. Again, no HR representative was present.

35.    During this meeting, Ms. Landry explained that compared to her White and/or non-Black peers, she had far less agency and choice on what accounts and industries she could work on.

36.    For instance, Ms. Landry pointed out how Vice President Sam Biederman, a White man, had said: "BerlinRosen saves its best accounts for [Account Coordinator] Alexandria Drake," a White woman at the same level as Ms. Landry.

37.    Ms. Landry explained that BerlinRosen's preferential treatment of her White peers was especially concerning, given the extremely high number of accounts she was working on and the high degree of initiative she had taken.

38.    She also reported that BerlinRosen's discriminatory culture was the reason Mr. Jackson had left the firm. Ms. Fitzgerald again said Mr. Jackson's leaving was a "cautionary tale."

39.    Ms. Cowdery and Ms. Shykula said that they were working on several initiatives to increase retention of Black junior staff. Ms. Shykula also acknowledged the rampant favoritism at BerlinRosen and said she was working on reducing it.

40.    But BerlinRosen took no remedial action. Ms. Alli continued to punish Ms. Landry and treat her disparately.

41.    In one notable example, Ms. Landry successfully pitched Lincoln Center Chief Artistic Officer Shanta Thake as a speaker for the highly sought-after Aspen Ideas Festival, which was widely acknowledged to be a big win.

42.    However, once Ms. Landry had gotten Ms. Thake approved as Festival speaker, Ms. Alli reassigned the speakership project, including all prep, to a White employee named Claudia Hensley. This was in stark contrast to the general practice, which was to allow the employee who pitched and won such a project to see it through to the end.

43.    On October 12, 2023, Ms. Fitzgerald gave Ms. Landry her year-end performance review. While Ms. Fitzgerald praised Ms. Landry's performance, she also said Ms. Landry came off as "unapproachable" and "unfriendly." This was indeed the "angry black woman" trope that Ms. Landry had anticipated, despite Ms. Fitzgerald's prior assurances to the contrary.

44.    They met again the following week, and Ms. Landry explained that this feedback was rooted in negative stereotypes about Black women. Ms. Fitzgerald then backpedaled and said she should not have included that critique in the review because it had nothing to do with job performance.

45.    At the end of November 2023, Ms. Landry asked Ms. Fitzgerald to remove her from the Lincoln Center account because of Ms. Alli's ongoing discrimination/retaliation, and because of Ms. Landry's outsized workload.

46.    BerlinRosen replaced Ms. Landry on the Lincoln Center account with a White woman named Maddy Rosen, whom Ms. Alli treated respectfully, and to whom Ms. Alli afforded more client interaction and other opportunities.

**VI.    <u>Third Round of Protected Activity; Retaliation</u>**

47.    By email to Ms. Fitzgerald dated December 7, 2023, Ms. Landry listed several examples of recent disparate treatment, suggested that Ms. Fitzgerald was "biased" against her and specifically asked for DEI intervention. Ms. Fitzgerald wasted no time that morning in telling

several senior team members about Ms. Landry's email, and these employees gave Ms. Landry the silent treatment.

48.     While ostracizing Ms. Landry, they spoke audibly to each other, in her presence, about her discrimination complaint, how much it had "upset" Ms. Fitzgerald and how "angry" it made them.

49.     At this point, the work environment became so hostile that Ms. Landry took a personal day to cope with her distress. She took the following day—December 8, 2023—off as well.

50.     While Ms. Landry was out of the office on December 8, 2023, Ms. Fitzgerald, Ms. Cowdrey, Mr. Tepper and Mr. Soria summoned her to a Google Meets and told her that because of the issues she had raised in her email, she was being transferred from Ms. Fitzgerald's subgroup of the Cities team to Mr. Soria's sub-group, and that he would be her new supervisor. As usual, HR did not join the meeting.

51.     Knowing how Mr. Soria had treated Mr. Jackson, and that Mr. Soria's practice areas (affordable housing and economic development) were not aligned with her own, Ms. Landry did not see any benefit in this transfer; on the contrary, it seemed to be punitive.

52.     Ms. Landry explained that simply transferring her to Mr. Soria's supervision did not address her concerns, create any positive change in the firm's culture or hold anyone accountable in any way. Rather, Ms. Landry said BerlinRosen was treating her as the problem, silencing her and sweeping her concerns under the rug.

53.     Toward the end of the meeting, after Ms. Fitzgerald and Ms. Cowdrey had left, Mr. Tepper and Mr. Soria told Ms. Landry that they were giving her a $5,000 raise and a promotion in

recognition of her strong job performance. They said she was a strong awards writer and that clients appreciated her hard work and dedication.

54.    The next week, on December 14, 2023, Ms. Landry met individually with Mr. Soria to discuss her transition to his team.

55.    In this meeting, Ms. Landry reiterated that she felt silenced and blamed after being ousted from Ms. Fitzgerald's work group.

56.    Ms. Landry also expressed concerns about racial tokenism and reported that Mr. Jackson had told her that Mr. Soria had tokenized his Blackness by having him appear at meetings with Black clients without allowing him to contribute. Mr. Soria replied that he had some "communication issues" that he was working on, and left it at that.

**VII.    More Racial Tokenism**

57.    In mid-January 2024, when working with Genesis Companies, a Black-owned real estate development firm, Mr. Soria kept pushing Black media outlets on the client, over the client's repeated objections and express desire not to be racially pigeon-holed in this way.

58.    The client consistently told Mr. Soria that he wanted to be seen as "just a developer and not a Black developer." Ms. Landry advocated for the client and kept trying to remind Mr. Soria of the client's wishes, but Mr. Soria ignored both her and the client.

**VIII.    Fourth Round of Protected Activity; Termination**

59.    Around that time in mid-January, Mr. Soria directed Ms. Landry to meet with HR Head Ursula Cassidy and Chief Culture Officer Thaly Germain to discuss her continuing concerns about race discrimination at the firm. Ms. Landry first met with Ms. Germain on January 23 and recounted her prior complaints and the retaliation that had followed.

60.     She explained that BerlinRosen had made no effort to hold either Ms. Alli or Ms. Fitzgerald accountable. Rather, the firm's solution had been to purge Ms. Landry from Ms. Fitzgerald's work group, without actually addressing her complaints of discrimination or retaliation.

61.     Ms. Germain promised to talk to the other people involved and get back to Ms. Landry with a solution, but she never made good on this promise.

62.     The following week, on January 31, Ms. Landry met with Ms. Cassidy via Google Meets. She began by telling Ms. Cassidy about BerlinRosen's lack of Black staff and low retention rates among Black employees.

63.     In response, Ms. Cassidy pointedly asked Ms. Landry what *she* had done to bring in more Black applicants, such as invite her "friends" to apply for positions at the firm – as though this were Ms. Landry's responsibility.

64.     Ms. Landry replied that she didn't feel comfortable recommending BerlinRosen to Black candidates because of the discrimination she and others had experienced at the firm.

65.     Ms. Cassidy then suggested that Ms. Landry meet with a therapist to process her emotions. Ms. Landry replied that she was already seeing a therapist and discussing these issues in therapy.

66.     Ms. Landry asked that BerlinRosen transfer her back to Ms. Fitzgerald's group, but Ms. Cassidy said that wouldn't be possible.

67.     At some point during this meeting, when Ms. Landry said she was working on 10 accounts, Ms. Cassidy exclaimed: "Holy smokes, that's a lot!"

68.     On February 7, union organizers from Communication Workers of America ("CWA") Local 1101 reached out to Ms. Landry to gauge her interest in joining the union. They

specifically said they had approached her because of the concerns she had raised about BerlinRosen's racist culture.

69.     A few weeks later, Ms. Cassidy followed up with an email stating that she had not found any evidence of retaliation and that the firm had only removed Ms. Landry from her work group to make Ms. Landry successful.

70.     By reply email dated February 13, Ms. Landry said she planned to raise her complaints to the EEOC.

71.     Later that same day, Ms. Cassidy, Ms. Germain and Mr. Soria called Ms. Landry via Google Meets to "go over the next steps."

72.     Ms. Landry said she was disappointed with the firm's failure to properly address her concerns. In response, Mr. Soria said that she should resign.

73.     When Ms. Landry replied that this was yet another indication of BerlinRosen's failure to take responsibility, Ms. Germain interjected that Ms. Landry could not choose her manager, admonished her to "give grace" and scolded her for "assuming" the company was discriminating or retaliating. Throughout the rest of the meeting, Ms. Cassidy, Ms. Germain and Mr. Soria all repeatedly urged Ms. Landry to resign.

74.     Mr. Soria ended the meeting by stating that Ms. Landry had until the following morning to decide whether she wished to resign. The following morning, Ms. Landry messaged Mr. Soria on Slack to say that she did not wish to resign, and that as long as she worked at BerlinRosen she would accept him as her manager.

75.     Mr. Soria replied that if she resigned, he would try to get her some severance pay. Ms. Landry again stated she did not wish to resign.

76.    On February 27, Ms. Landry had an asthma attack, which caused her to be late to work for the first time; indeed, she was usually one of the first people in the office and one of the last to leave.

77.    She notified Mr. Soria that her tardiness was due to an asthma attack. In response, he demanded an apology and insisted on advance notice, as though an asthma attack could be planned ahead of time.

78.    The following day, on February 28, Ms. Landry signed the CWA card and joined the Union. Mr. Soria knew that she had joined the union because she had mentioned it to him, and/or in his presence, on various occasions.

79.    Two weeks later, BerlinRosen fired Ms. Landry. Ms. Cassidy and Mr. Soria summoned her to a Google Meets and said that they were firing her based on her "performance."

80.    When Ms. Landry asked how her performance was lacking, Mr. Soria said they couldn't go into specifics but that she "shouldn't be surprised" by her termination "based on our recent conversations," none of which were performance-related, and all of which pertained to race discrimination and/or union organizing and/or her asthma attack.

81.    In other words, the firm was firing her for legally protected activities, and the unnamed "performance" issues were pretextual.

**IX.    Damages**

82.    Ms. Landry is early in her public relations career—an industry where success hinges on one's connections with clients and media representatives. BerlinRosen's abrupt termination of her employment has forced her to rebuild her career from ground zero. Her previous media connections have even reached out to her, expressing frustration over her abrupt departure.

83.     Despite diligent efforts and multiple rounds of interviews, she was not able to obtain new employment in New York, and had to accept a lower-paying position in D.C. this spring. Thus, in addition to lost income, her termination has cost her thousands of dollars in relocation fees, which continue to accrue. Relocating to find new employment has also isolated her from her social ties and has prevented her from spending time with her friends and family.

84.     Ms. Landry has also suffered substantial emotional distress, with physical manifestations, as a result of Defendants' unlawful actions. She has had trouble eating, sleeping and finding enjoyment in her everyday life. Her therapist will testify that she discussed BerlinRosen's mistreatment of her in contemporaneous therapy sessions, and that Ms. Landry experienced anxiety and depression as a result of the firm's actions.

**FIRST CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**Discrimination**

85.     Ms. Landry incorporates each and every allegation of this Complaint as if fully set forth herein.

86.     Ms. Landry is a dark-skinned Black woman.

87.     BerlinRosen subjected Ms. Landry to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

88.     BerlinRosen's adverse and/or differential treatment of Ms. Landry was motivated by her protected statuses, either in whole or in part.

89.     As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations,

suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

90.     BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

91.     Ms. Landry prays that the Court find BerlinRosen liable for discrimination in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SECOND CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**Retaliation**

92.     Ms. Landry incorporates each and every allegation of this Complaint as if fully set forth herein.

93.     Ms. Landry engaged in activity protected by 42 U.S.C. § 1981, including but not necessarily limited to reporting race discrimination and retaliation to BerlinRosen leadership.

94.     BerlinRosen took adverse action against Ms. Landry, including, *inter alia*, terminating her employment following her protected complaints.

95.     BerlinRosen's adverse actions toward Ms. Landry were motivated by her protected activity, either in whole or in part.

96.     As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

97.     BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

98.     Ms. Landry prays that the Court find BerlinRosen liable for retaliation in violation of 42 U.S.C. § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**THIRD CAUSE OF ACTION**
**Violation of Title VII**
**42 U.S.C. § 2000e-2**
**Discrimination**

99.     Ms. Landry incorporates each and every allegation of this Complaint as if fully set forth herein.

100.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of Title VII.

101.    Ms. Landry is a dark-skinned Black woman.

102.    BerlinRosen subjected Ms. Landry to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

103.    BerlinRosen's adverse and/or differential treatment of Ms. Landry was motivated by her protected statuses, either in whole or in part.

104.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

105.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

106.    Ms. Landry prays that the Court find BerlinRosen liable for discrimination in violation of 42 U.S.C. § 2000e-2, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FOURTH CAUSE OF ACTION**
**Violation of Title VII**
**42 U.S.C. § 2000e-2**
**Retaliation**

107.    Ms. Landry repeats and realleges the allegations in this Complaint as if fully set forth herein.

108.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of Title VII.

109.    Ms. Landry engaged in activity protected by Title VII, including but not necessarily limited to reporting race discrimination and retaliation to BerlinRosen leadership.

110.    BerlinRosen took adverse action against Ms. Landry, including, *inter alia*, terminating her employment following her protected complaints.

111.    BerlinRosen's adverse actions toward Ms. Landry were motivated by her protected activity, either in whole or in part.

112.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

113.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

114.     Ms. Landry respectfully prays that this Court adjudge BerlinRosen liable for retaliation in violation of Title VII and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

### FIFTH CAUSE OF ACTION
**Violation of the Americans with Disabilities Act**
**42 U.S.C. § 12101 et seq.**
**Discrimination**

115.     Ms. Landry incorporates each and every foregoing and succeeding paragraph of this Petition as if fully set forth herein.

116.     At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the ADA.

117.     Ms. Landry has asthma, a condition that qualifies as a disability within the meaning of the ADA.

118.     Ms. Landry was qualified to perform the essential functions of her job, with or without reasonable accommodation.

119.     On February 27, 2024, Ms. Landry suffered an asthma attack that caused her to be late to work. She informed her supervisor that she had been late due to an asthma attack. In response, he demanded an apology and insisted on advance notice the next time she had an asthma attack.

120.     In this way, BerlinRosen also failed to reasonably accommodate Ms. Landry, who was not able to anticipate her asthma attacks in advance.

121.     Two weeks later, BerlinRosen terminated Ms. Landry's employment.

122.     BerlinRosen's termination of Ms. Landry was motivated by her asthma attack and/or her disability, either in whole or in part.

123.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

124.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

125.    Ms. Landry respectfully prays that this Court adjudge BerlinRosen liable for disability discrimination in violation of the ADA, and grant all relief allowed under the law, as set forth in the Prayer in this Petition.

**SIXTH CAUSE OF ACTION**
**Violation of the Family and Medical Leave Act**
**29 U.S.C. § 2601 et seq.**
**Retaliation**

126.    Ms. Landry repeats and realleges the allegations in this Complaint as if fully set forth herein.

127.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the FMLA.

128.    Ms. Landry was eligible for FMLA leave on February 27, 2024, when she suffered an asthma attack that caused her to arrive late to work.

129.    Ms. Landry exercised FMLA-protected rights by, *inter alia*, coming to work late after suffering from asthma attack; the work time she missed as a result of her asthma attack constituted an FMLA-protected leave.

130.     Ms. Landry informed her supervisor that she had been late due to an asthma attack. In response, he demanded an apology and insisted on advance notice the next time she had an asthma attack.

131.     Two weeks later, BerlinRosen terminated Ms. Landry's employment.

132.     BerlinRosen's termination of Ms. Landry was motivated by her FMLA-protected activities, either in whole or in part.

133.     As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

134.     BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

135.     Ms. Landry prays that the Court find BerlinRosen liable for retaliation in violation of the FMLA, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## SEVENTH CAUSE OF ACTION
### Violation of the New York State Human Rights Law
### N.Y. Exec. Law 290 et seq.
### Discrimination

136.     Ms. Landry incorporates each and every allegation of this Complaint as if fully set forth herein.

137.     At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the NYSHRL.

138.      Ms. Landry is a dark-skinned Black woman who suffers from asthma.

139.    BerlinRosen subjected Ms. Landry to differential terms and conditions of employment, harassed her, subjected her to a hostile environment, and terminated her.

140.    BerlinRosen's adverse and/or differential treatment of Ms. Landry was motivated by her protected statuses, either in whole or in part.

141.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

142.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

143.    Ms. Landry prays that the Court find BerlinRosen liable for discrimination in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## EIGHTH CAUSE OF ACTION
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law 290 et seq.**
**Retaliation**

144.    Ms. Landry repeats and realleges each and every allegation of this Complaint as if set forth herein.

145.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the NYSHRL.

146.    Ms. Landry engaged in activity protected by the NYSHRL, including but not necessarily limited to reporting race discrimination and retaliation to BerlinRosen leadership.

147.    BerlinRosen took adverse action against Ms. Landry, including, *inter alia*, terminating her employment following her protected complaints. .

148.    BerlinRosen's adverse actions toward Ms. Landry were motivated by her protected activity, either in whole or in part.

149.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

150.    BerlinRosen's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

151.    Ms. Landry prays that this Court find BerlinRosen liable for retaliation in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

## NINTH CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code 8-101 et seq.
### Discrimination

152.    Ms. Landry incorporates each and every allegation of this Complaint as if fully set forth herein.

153.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the NYCHRL.

154.    Ms. Landry is a dark skinned Black woman who suffers from asthma.

155.    BerlinRosen treated Ms. Landry less well than other employees outside of her protected status(es).

156.    BerlinRosen's adverse and/or differential treatment of Ms. Landry was motivated by her protected statuses, either in whole or in part.

157.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

158.    BerlinRosen's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

159.    Ms. Landry prays that the Court find BerlinRosen liable for discrimination in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## TENTH CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code 8-101 et seq.
### Retaliation

160.    Ms. Landry repeats and realleges each and every allegation of this Complaint as if set forth herein.

161.    At all times relevant, Ms. Landry was an employee and BerlinRosen was an employer within the meaning of the NYCHRL.

162.    Ms. Landry engaged in activity protected by the NYCHRL, including but not necessarily limited to reporting race discrimination and retaliation to BerlinRosen leadership.

163.    BerlinRosen took adverse action against Ms. Landry, including, *inter alia*, terminating her employment following her protected complaints.

164.    BerlinRosen's adverse actions toward Ms. Landry were motivated by her protected activity, either in whole or in part.

165.    As a direct and proximate result of BerlinRosen's unlawful actions, Ms. Landry has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain with physical manifestations, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

166.    BerlinRosen's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Landry's rights, justifying punitive damages.

167.    Ms. Landry prays that this Court find BerlinRosen liable for retaliation in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer to this Complaint.

## JURY DEMAND

168.    Ms. Landry respectfully demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Ms. Landry respectfully requests that this Court grant judgment for her and order the following relief against Defendants:

(1)    A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Ms. Landry's rights as secured by Section 1981; Title VII; the ADAAA; the FMLA; the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.;

(2)    Reinstatement to the highest position to which Ms. Landry was and would be entitled and/or front pay;

(3)    Compensatory damages in the form of:

(a) back pay with interest based on Ms. Landry's appropriate compensation had she not been wrongfully terminated;

(b) unpaid overtime wages;

(c) reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial; and

(d) damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial;

(e) damages for future economic loss;

(4)    Liquidated damages and penalties;

(5)    Punitive damages;

(6)    Statutory attorneys' fees, expert fees, costs, and disbursements;

(7)    Interest; and

(8)    Such other and/or further relief as the Court deems just and proper.

Dated: December 9, 2024                        Respectfully submitted,
New York, NY

                                              KEENAN & BHATIA, LLC

                                              */s/ Chloe Liederman and E.E. Keenan*

                                              Chloe Liederman
                                              Edward (E.E.) Keenan
                                              233 Broadway, Suite 1810
                                              New York, NY 10279
                                              Tel: (212) 470-2560
                                              chloe@keenanfirm.com
                                              ee@keenanfirm.com

                                              *Attorneys for Plaintiff Landry Bianca*